**In re Samuel R. BALLACHINO, Debtor.**

**In re Fred Grant Morse, III, Debtor.**

**Bankruptcy Nos. 99–3254–9P3, 99–3255–9P3.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Aug. 31, 1999.

Edward R. Miller, Naples, FL, for Samuel R. Ballachino and Fred Grant Morse, III.

Robert Zarco, Miami, FL, for movant.

Terry E. Smith, Bradenton, FL, Chapter 13 Trustee.

## ORDER ON MOTION TO DISMISS CHAPTER 13 PETITION OR, IN THE ALTERNATIVE, TO LIFT AUTOMATIC STAY IN ORDER TO LIQUIDATE CLAIMS AGAINST DEBTOR

ALEXANDER L. PASKAY, Chief Judge.

The explosive proliferation of the franchise industry over the past decades produced some spectacular successes but also some colossal failures. This, of course, produced numerous controversies leading to extensive litigations by disenchanted franchisees who claim to have been promised by the franchisor a pot of gold but which promise turned to be nothing but fool's gold and the loss of a substantial investment. It is not surprising that this extensive explosion in the franchise industry was not limited to the fast food industry, but also, ironically, to the very opposite, the weight reducing and wellness area. This development is not surprising when one considers the insatiable desire of a contemporary society to be super healthy and slim.

The present controversy in these cases precisely reflects this scenario and finds its genesis in weight reducing and wellness programs promoted through franchises sold by Samuel R. Ballachino and Fred Grant Morse, III (Debtors) to Christine

LaValle, Cape Coral Wellness, Inc., Peter F. and Christine Sonderegger, O & S Properties, Rick and Patti Albritton, R.P.E.L., Inc., Sharon J. Bullock–Brown, S.A. Ventures, Inc., Brian and Barbara McNichols, and Beverly Hills Weight Loss & Wellness, Inc. (the Movants).

The Movants became disenchanted with the franchises purchased from the Debtors and ultimately filed lawsuits in various state courts and one federal district court. One of the suits was filed by Patty Albritton and others in the Circuit Court in and for Collier County, Florida (the "Albritton Lawsuit"). In addition LaValle and Cape Coral Wellness, Inc. filed lawsuits. The Debtors and others filed a motion to submit the matters to arbitration. An arbitration proceeding was commenced with the American Arbitration Association (AAA) in Boston, Massachusetts, in December 1998. The Debtors objected to the selection of the arbitrators and filed a civil suit in the Massachusetts state court seeking declaratory and injunctive relief to modify the makeup of the panel. On March 3, 1999, the AAA decided to proceed with arbitration notwithstanding the pending objection by the Debtors.

The arbitration proceeding came to a sudden halt when the Debtors filed their respective voluntary Petitions for relief under Chapter 13 of the Bankruptcy Code.

On December 4, 1998, four other sets of franchisees filed lawsuit against Morse, Ballachino and others, which includes also as defendant Beverly Hills Weight Loss and Wellness, Inc. (BHWLW). This lawsuit was basically identical with the LaValle lawsuit. The plaintiffs in this lawsuit commenced settlement negotiations with BHWLW and ultimately settled with the franchisor. This left for resolution their claims against Morse and Ballachino and their companies who are actively defending this lawsuit. The trial date has not been set although discovery commenced in this lawsuit. It is likely that the resolution of the LaValle would have a controlling affect on the multiple franchisee lawsuits against the Debtors and their companies.

The Movants filed the present Motion, seeking dismissal of both Chapter 13 cases on the basis of bad faith or, alternatively, relief from the automatic stay to proceed with arbitration. In due course, the Motion was set for final evidentiary hearing at which time the following relevant facts were established:

BHWLW is a Rhode Island corporation maintaining its principal place of business in Guilford, New Hampshire. BHWLW is a national franchisor of weight loss clinics. At the relevant time, Morse was the president and principal stockholder of Health and Wellness, Inc. (HWI) and BHMC, Inc. These entities were appointed by the franchisor as regional directors for the states of Florida and Georgia and charged with the development of franchises in these states. Both Debtors were the principals who actually sold franchises in these states, including the franchises sold to LaValle as well as the franchises sold to the plaintiffs in the actions instituted against the Debtors.

In 1997, the Debtors purchased a lot in Naples, Florida, and ultimately constructed a residential home on the same. The cost of the construction was in excess of $600,000 and the price of the lot was $140,000. The Debtors paid cash for the purchase of the lot and for the construction of the home.

Until September 1998, the home was the residence of both. It is still the current residence of Morse. The residence was owned by both Debtors as tenants in common until July 30, 1998, when the Debtors as grantors, conveyed the full title to the residence to Morse. Presently, the house appears to be worth $1.2 to $1.3 million. Morse paid Ballachino $725,000 for his interest in the home. Morse claims that the $725,000 was obtained by him by liquidating some investments, i.e., money in a money market account, a stock portfolio, certificates of deposit and an account

maintained by Smith Barney brokerage house.

The Statement of Financial Affairs filed by Morse reflect gross income of $379,329 in 1997, described as wages; $174,412 in 1998, described as wages; and $4,300 during the first part of 1999 up to the filing date, February 26, 1999. The Statement of Financial Affairs also reflect that at the relevant time, Morse was the sole stockholder and the principal officer of BHMC, Inc., West Coast Wellness, Inc. 95–98 and Health and Wellness, Inc.

It appears that in December 1997, the Debtors purchased a Crownline Power boat, paying $30,000 cash for the purchase. In August 1998, the Debtors transferred their interest in the boat to Ballachino's mother, Florence Ballachino. Facially, the transaction appears to be an outright sale for no consideration, although both Debtors contend it was a transfer as collateral for a loan each received from Ms. Ballachino in the amount of $5,000. Why Mr. Ballachino needed $5,000 after he received $725,000 from Morse for his interest in the former residence was not explained. The boat currently is docked in Key Largo and is registered in the name of Mrs. Ballachino.

Morse's Schedule of Assets reflect that Morse holds 100 percent of the stock in BHMC, Inc.; Westcoast Wellness, Inc., and Health and Wellness, Inc. The scheduled value of the stock is $1 each, or a total of $3.00. Even though his interest in the boat was transferred to Ms. Ballachino, Morse still scheduled a ½ ownership interest in the boat and scheduled Mrs. Ballachino as a secured creditor holding a claim in the amount of $10,000, describing the collateral as the Crownline Boat which debt allegedly was incurred by him in the amount of $10,000 in September 1998 after lawsuits had been filed against him.

On Schedule F, Morse listed only one liquidated claim, the claim of American Express in the amount of $3,926. The balance of the scheduled creditors consist of the plaintiffs who filed the lawsuits described above. Their claims are scheduled as contingent, unliquidated, and disputed. On his current income and expenses in Schedule I, Morse estimates his current monthly gross wages to be $4,000 or his total net monthly take home pay after taxes to be $3,400&. Morse filed an objection to all of the Movants' claims. A hearing has not been scheduled yet.

The record reveals that on March 4, 1999, the Debtor filed his Chapter 13 Plan, proposing to pay the equity mortgage on the current residence outside of the Plan. The Debtor also proposes to pay outside the plan, the secured claim of Ms. Ballachino. Morse proposed to pay the only unsecured claim, that of American Express, in full over 36 months during the life of the Plan. The Plan is totally silent as to the treatment of Movants' claims. This, no doubt, is based on the supposition that Morse will be successful in defeating Movants' claims.

Ballachino, as noted earlier, purchased the home together with Morse and lived with Morse in that residence until he purchased his current residence located a 1330 Via Portafino, Naples, Florida. The property was purchased in September 1998 for $625,000 in cash. The $625,000 used to purchase this home was part of the $725,000 Ballachino had received from Morse. Ballachino claims that the $100,000 excess was and is still tied up in litigation and held in escrow for another home which was not purchased. The Via Portafino property was purchased from Mr. and Mrs. Rosser, who on September 23, 1998, executed a warranty deed in favor of Ballachino.

Ballachino currently leases a Mercedes convertible for a monthly payment of $1,200.00. In 1997, Ballachino's income was $204,689. His Statement of Financial Affairs reflects income of $204,689 in 1997; $46,800 in 1998, and $5,000 from January 1999 until the filing of this case. The Schedules disclosed the transfers by Ballachino of his interest in the Crownline to his mother and the transfer of his interest to

Morse in the Spanish Moss Trail property. Ballachino was the 100 percent stockholder of Florida Wellness, Inc. and Gulf Coast Wellness, Inc. Ballachino scheduled his stock interest in these corporations on Schedule B and valued them at $1 each. Ballachino, just like Morse, scheduled his ½ interest in the Crownline boat and scheduled his mother as a secured creditor with a lien securing an indebtedness of $10,000 on the boat.

Ballachino scheduled twenty-one creditors holding contingent, unliquidated, and disputed claims. He also scheduled only one undisputed claim, that of Shell Mastercard, indicating a balance of $5,790. On Schedule I, Ballachino scheduled current monthly gross wages at $4,000 or a net take home pay after taxes at $3,141.

Ballachino also filed an objection to the disputed claims. The objection is yet to be scheduled and heard by this Court.

On March 4, 1999, Ballachino filed his Chapter 13 Plan. The Debtor proposed to submit to the trustee $169.30 for 36 months. The Plan proposed to deal only with the claim of Shell Mastercard and pay the $5,790 in full during the life of the Plan. While the Plan mentions his mother's secured claim, the Debtor plans to deal with this debt outside the Plan. The Debtor plans to assume the lease on the Mercedes Benz. The Plan is totally silent as to Movants' claims. Ballachino, like Morse, expects to successfully have those claims disallowed.

Based upon these facts, Movants contend that the Debtors' Petitions were filed in bad faith for the sole limited purpose of avoid litigation. In the alternative, Movants contend that their claims are clearly unliquidated and possibly contingent and, therefore, their claims must be liquidated or estimated before the claims may be allowed, as required by Section 502(c) of the Bankruptcy Code. For this reason, Movants request that they be permitted to proceed in nonbankruptcy forums where suits have already been filed and to allow the LaValle Plaintiffs to proceed with the arbitration scheduled to commence on August 8, 1999.

The primary thrust of the attack on the Debtors' rights to seek relief under Chapter 13 of the Bankruptcy Code is based on the obvious, that the sole motivation and the driving force of these Debtors is to seek relief from the pending litigations, the outcome of which may have a devastating effect on their financial futures.

■ In further support of their bad faith argument, Movants also contend that the Debtors engaged in improper and fraudulent conduct. They contend that Morse's sale to Ballachino of his ½ interest in the Spanish Moss Trail property was really a sham because the alleged purchase price was a fiction. The quit claim deed evidencing the transfer reflects that $.70 was paid to the State of Florida. Movants make a quantum leap in concluding that Morse did not pay $725,000 to Ballachino for the transfer.

■ Obviously, a debtor's acquisition of property cannot constitute a fraudulent transfer. The very nature of a transfer is to divest the Debtor of an interest in property, not to acquire an interest. Thus, Ballachino's purchase of the Porta Fino property cannot constitute a fraudulent transfer.

Movants also rely on the fact that both Ballachino and Morse liquidated their investments. There was absolutely nothing wrong with this. Morse obviously needed funds to pay Ballachino for his interest in the Spanish Moss property.

■ Movants also challenge the propriety of a transfer of a 1998 Mercedes Benz station wagon to Florence Ballachino. This fact is irrelevant because the station wagon was owned by BHMC, not Morse. Corporate properties are owned by the corporation, not the corporation's stockholders. In any event, the argument that Ms. Ballachino paid nothing for the station wagon is not supported by this record at all.

The only possible suspect transaction is the Crownline Boat. Facially, contrary to the Debtors' contentions, their entire interest in the boat was transferred to Ms. Ballachino. Ms. Ballachino was not merely granted a security interest in the boat to secure the $10,000 loan. Yet, whether labeled as a transfer of title or a security interest, the transaction was fully disclosed on the schedules of both Debtors.

The last transfer alleged to be fraudulent is the transfer of the 1997 Mercedes Benz C–280 to Ms. Ballachino. Again, the difficulty is that the vehicle was not owned by Ballachino but by BHWI. Further, nothing in this record indicate what consideration, if any, was paid for this transfer. Thus, Movants' belief that none was paid is not supported by this record.

In the last analysis, it is clear that but for Movants' claims, neither Debtor would be seeking relief in the bankruptcy court. The Debtors could easily handle the minimum payments required on their respective credit cards. Movants are entitled to establish liability and liquidate their claims. As the Debtors have filed an objection to their claims, the claims cannot be allowed by virtue of 502(c), but must be either liquidated or estimated. These claims are as pending now in the state court involves jury trial. The claims of the LaValle Plaintiffs are scheduled for arbitration on August 8, 1999. The resolution of the LaValle Plaintiffs' claims be arbitration might very well control the disposition of the other claims asserted by Movants and possibly eliminate the necessity of extensive and expensive litigation.

 For the sake of judicial economy it appears to be prudent to modify the stay and authorize the Movants to complete the arbitration proceeding. In the event the arbitration panel renders an award in favor of Movants, which is finalized by the entry of a judgment, the Debtors should be given an opportunity to obtain relief in the context of a Chapter 13 case.

Based on the foregoing, this Court is satisfied that the Motion to Dismiss the Chapter 13 cases of these Debtors should be denied without prejudice. This Court is equally satisfied that the alternative Motion for Relief From Stay should be modified to the limited extent of permitting Movants to complete the arbitration proceeding. This conclusion should not be construed to cover the other litigations for which the automatic stay shall remain in full force and effect at this time.

Accordingly, it is

ORDERED, ADJUDGED and DECREED that the Motion to Dismiss be, and the same is hereby denied. It is further

ORDERED, ADJUDGED and DECREED that the alternative Motion For Relief From Automatic Stay be, and the same is hereby granted. The automatic stay imposed by 11 U.S.C. § 362 is hereby modified for the sole purpose of allowing Movants to proceed with the arbitration. The automatic stay shall remain in full force and effect with respect to all other pending litigations.